## W. F. TAYLOR CO., Inc., v. WHITBECK.
### No. 4925.

Court of Appeal of Louisiana.
Second Circuit.
Feb. 5, 1935.

**188**

T. O. Brooks, of Shreveport, for appellant.

Chandler & Chandler, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff seeks to recover alleged balance due of $457.36 on open account. The correctness of the account, extending over several years, is only challenged in three respects, viz.: (1) As to interest charges; (2) amount of credit given for net proceeds of sale of 19 bales of cotton delivered to plaintiff against the account in the fall of 1931; and (3) amount of credit given for net proceeds of sale of 23 bales of cotton pledged as security to the account in the fall of 1929.

Defendant's contention is that the cotton was delivered in pledge to plaintiff as collateral security to the account with the distinct understanding and agreement that it would not be sold by plaintiff until defendant authorized that such be done. The 23 bales of cotton were delivered to plaintiff purely as collateral, as it does not appear that plaintiff had any lien thereon as furnisher. It did have a lien on the 19 bales, as furnisher of money to enable or assist defendant to produce them. This lot of cotton was sold on January 25, 1932, for 6.33 cents per pound, and net proceeds of $601.42 then credited on the account. The 23-bale lot was sold on

March 8, 1930, at 13.11 cents per pound. On July 12, 1933, defendant instructed plaintiff to sell all of the cotton. It does not appear definitely that he had been notified of either sale prior to this date. He denies that any notice was given him. On July 12, 1933, the market price per pound of cotton of the grade and character of this was 11.75 cents. Defendant's position is that as to the 19 bales he should be credited therewith at the price of 11.75 cents per pound, and as to the 23 bales he should be credited with the price it actually sold for, some three years before he authorized its sale. By way of reconvention, he prays for judgment for nearly $3,000 against plaintiff.

The case was tried on an agreed statement of facts plus some testimonial proof. The terms and conditions of the agreements under which the two lots of cotton were delivered to plaintiff were the only questions of fact not agreed to in the stipulations. After eliminating the several items of interest charged into the account, but allowing interest otherwise, and increasing the credit item represented by the net proceeds of the 23 bales of cotton, the lower court gave judgment for plaintiff. This appeal is prosecuted by defendant.

Defendant does not seriously complain against the ruling of the lower court as regards sale of the 19 bales. The court found and held that this cotton was delivered to plaintiff on the account without any agreement on part of plaintiff to hold it subject to defendant's wishes as to when sold; that the testimony sustained plaintiff's contention on this issue of fact, and proper credit had been given therefor. We have weighed the testimony on this issue, and agree with the conclusions of the lower court. It would be a must unusual commitment on part of one furnishing supplies or money to plant, cultivate, and harvest a crop of cotton for him to agree to hold such cotton, when delivered to him, subject to the wishes of the debtor as to its sale, without limitation of term. Proof of such agreement should be unusually clear and convincing.

Defendant assigns as error in the judgment the allowance of interest on any part of the account in excess of that prayed for. The petition states that legal interest is due thereon from July 13, 1932. The prayer is in keeping with this allegation.

The lower court sustained plaintiff's contention that defendant was entitled to credit for sale of the 23 bales of cotton on the basis

of market price thereof as of July 12, 1933; or, in other words, at the price of 11.75 cents per pound, and not 13.11 cents per pound, the price it actually brought in 1930. This ruling is vigorously assailed. The difference between the two prices would be approximately $166. Plaintiff admits that it did agree to hold the lot of 23 bales until its sale was authorized by defendant; and asserts that the agreement was not in reality breached by it.

It appears that plaintiff sold this lot of cotton along with a larger number of bales owned by it. A list of all of the cotton was made up, prices fixed, and futures were bought to correspond therewith. Plaintiff's president testified, and he is not contradicted, that, when defendant instructed him to sell his cotton, the broker or warehouseman was called up and directed to sell the 23 bales which had been bought for defendant. This was done and credit given accordingly, less carrying charges from date spot cotton was delivered to plaintiff until sale of the futures. He stated further that he never intended to agree to hold the spot cotton indefinitely, and felt that he had fully protected defendant in adopting the course he did.

A carrying charge of $187.45 was made against the proceeds of sale of the futures. This was reduced to $49.45, the amount of such charges incurred in carrying the spot cotton to date of its sale.

We do not think that the hedging course pursued by plaintiff enters into the case in the least. If it desired to try to protect itself by purchasing futures, that was a matter which did not and should not have concerned defendant in the least. He had not authorized that such be done. His cotton had been sold and he was entitled to prompt notice thereof, with details of the sale, as is required by Act No. 206 of 1906. The fact that such notice was not given him certainly discloses that plaintiff did not desire that he know of the sale.

As found by the lower court, defendant's reconventional demand, so far as it relates to his claim of ownership of the entire net proceeds of the sale of the 23 bales in March, 1930, is based upon the doctrine laid down in R. C. L., vol. 21, § 37: "And, since the pledgee impliedly agrees faithfully to hold the pledge until the conditions have been performed upon the faith of which the choses in action, goods, or personal chattels have been delivered to him the rule is general, if not universal, that the wrongful or unauthorized disposition of pledged property by the pledgee or his agent so as to put it out of his power to redeliver it on payment of the debt which it secures is a conversion for which an action will lie. * * * In the case of an authorized sale by the pledgee the pledgor has his election either to ratify such sale, and claim the benefit of it, or to repudiate it and hold the pledgee in damages."

This principle is set forth with equal clarity in 49 C. J. pp. 1010 and 1011, § 271: "The pledgor, upon being informed of an unauthorized sale by the pledgee, may elect to ratify the sale and claim the benefit of the surplus, or he may repudiate the sale and credit of the surplus and hold the pledgee responsible for the property. Accordingly, upon such a wrongful sale, the pledgor may sue either in trover for the conversion, or he may maintain an action on the case for damages, even though he is precluded by lapse of time from avoiding the sale; or, if he elects to ratify the sale, he may sue in assumpsit for the proceeds, as money received to his use; or he may plead such conversion as a set-off to a suit on the original debt by the pledgee; or, where the circumstances are such that there is no adequate remedy at law, he may sue the pledgee in equity to recover the property, or to recover the proceeds thereof."

It is clear therefrom that among the remedies or actions the pledgor has, after being advised of the unauthorized sale of the pledged property, are these: (1) Ratify the sale and claim the benefits of it, which means to recover the proceeds of the sale; or (2) repudiate it and hold the pledgee in damages. As a general rule the pledgor defendant is entitled to set off against the debt he owes the pledgee any profits or proceeds realized by pledgee from sale of the pledged collateral. 49 C. J. p. 990, § 231.

Defendant contends that the substance and effect of his reconventional demand, wherein he sues for the net proceeds of sale of the spot cotton, is not an action in damages against plaintiff, but an action to recover the full price of the sale, and therefore a ratification of the sale. The trial judge, after commenting upon the lack of certainty of defendant's position, as reflected from his answer and reconventional demand, stated that it more nearly resembled an action in damages, and, if thus construed, the judgment given him fully responded to any right in damages had by him; and further held that if defendant was seeking to claim full benefits of the unauthorized sale of his cotton he had not definitely ratified the sale,

and therefore was not in a position to claim said benefits. We here quote those articles of defendant's answer and reconventional demand pertinent to the question, viz.:

"Defendant further shows that in violation of said working agreement and without any instructions whatsoever from your defendant, your defendant believes and believing therefore alleges that said 23 bales of cotton had already been sold long prior to the date when instructions were given by defendant to plaintiff to sell same and said cotton brought a price much higher than the market price prevailing on July 13, 1933, the date when instructions were given to plaintiff.

"That your defendant has been informed and therefore believes and alleges that the price received from the sale by plaintiff of said 23 bales of cotton approximated 13.10 cents per pound, making a total price from said 12,250 pounds of cotton of $1,604.75.

"Your defendant shows that said 23 bales of cotton was sold in violation of the defendant's contract with plaintiff and at a profit to plaintiff himself; that under the law of the State of Louisiana your defendant is entitled to any profit made by plaintiff in the sale of defendant's cotton in violation of defendant's contract with plaintiff."

■ We think a fair interpretation of these allegations, in the light of undisputed facts, is that defendant ratified the sale of his spot cotton and is seeking to recover (or secure credit) therefor. It is hornbook that one who sues for the price of unauthorized or illegal sale of his property, by an agent, is held to have ratified the sale thereof. Surgat v. Potter et al., 12 Mart. (O. S.) 365; Zino v. Verdelle, 9 La. 51; Szymanski v. Plassan, 20 La. Ann. 90, 96 Am. Dec. 382; Succ'n of Gilmore, 154 La. 105, 97 So. 330, 331; Mathews v. D'Asaro, 14 La. App. 328, 126 So. 246.

The duties and obligations of the pledgee toward the pledgor may well be assimilated to those due by the mandatory or agent to the principal.

Defendant, in the present case, had knowledge of the unauthorized sale of his cotton by plaintiff in July, 1933. He took no action or steps to repudiate the sale at all. So far as the record discloses, he did nothing about it, until after this suit was filed some 60 days later. His inaction and subsequent demand for the proceeds of the sale amount to a ratification of the sale.

In Succession of Gilmore, supra, it is said: "An unauthorized contract of an agent is ratified by the principal, who, when notified of such contract, does not immediately repudiate it, but accepts the benefit arising under such contract."

■ In considering this matter, the question may pertinently be asked, To whom did the cotton belong after being pledged to plaintiff? The answer is found in article 3166 of the Civil Code: "Until the debtor be divested from his property (if it is the case), he remains the proprietor of the pledge, which is in the hands of the creditor only as a deposit to secure his privilege on it."

This being true, does it not follow that the price of the sale of the pledged goods belongs to the owner of the goods? By what process of reasoning could it be said that any part of this price belongs to plaintiff? We are unable to perceive that it has any legal, equitable, or moral right thereto. The law seems clear on the point. Article 3172 of the Civil Code plainly says: "If the proceeds of the sale exceed the debt, the surplus shall be restored to the owner; if, on the contrary, they are not sufficient to satisfy it, the creditor is entitled to claim the balance out of the debtor's other property."

Suppose those proceeds had been sufficient to have extinguished the balance due on the account, could it be reasonably argued that compensation or set-off did not automatically take place? We do not think so.

■ We think the proceeds of sale of this spot cotton, less carrying charges of $49.45, should have been credited on the account against defendant as of March 8, 1930. Succession of Pierre Lanaux, 47 La. Ann. 643, 17 So. 200, supports this conclusion.

As stated before, plaintiff has asked for interest allowance from July 13, 1932. This should have been July 13, 1933, the date the proceeds of sale of futures were credited on the account. The debit part of the account discloses that interest thereon was calculated each year and charged into the account. The last of such charges was of July 13, 1933, and plaintiff evidently intended to claim interest from that date. In view of the fact that the account included specific charges of interest from year to year, beginning with December 31, 1929, when a balance thereon was struck, we think the lower court's conclusions, as regards the date when interest on the various debit items should begin to run, correct.

For the reasons assigned, the judgment appealed from is hereby amended by increasing the credit item thereon, representing net proceeds of sale of the 23 bales of cotton,

from $1,323.05 to $1,549.97, and fixing the date of such increased credit on the account as March 8, 1930, instead of July 13, 1933; and, as amended, said judgment is affirmed; costs of appeal are assessed against plaintiff; all other costs against defendant.